## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MEDICA INSURANCE COMPANY, INC.<br>401 Carlson Parkway<br>Minnetonka, MN 55305,<br><br>*Plaintiff*,<br><br>v.<br><br>XAVIER BECERRA,<br>in his official capacity as SECRETARY OF<br>HEALTH AND HUMAN SERVICES,<br>UNITED STATES DEPARTMENT OF<br>HEALTH AND HUMAN SERVICES,<br>200 Independence Avenue, S.W.,<br>Washington, D.C. 20201,<br><br>*Defendant*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. _____ |

## COMPLAINT

Plaintiff Medica Insurance Company, Inc. (Medica) brings this Complaint against

Defendant Xavier Becerra, in his official capacity as Secretary of the United States Department

of Health and Human Services (HHS), and alleges as follows:

### PRELIMINARY STATEMENT

1.      This action challenges a recent decision by the Administrator of the Centers for

Medicare & Medicaid Services (CMS) that unlawfully reduced Medica's reimbursement from

Medicare for services furnished to enrollees in Medica's cost plan.  The Administrator's decision

flies in the face of the agency's governing statutes, binding regulations, and this Court's own

prior rulings.  *See, e.g.*, *Medica Ins. Co. v. Becerra*, No. 1:22-cv-1440-RCL, 2023 WL 6314571

(D.D.C. Sept. 28, 2023) (RCL).  For all of these reasons, it is unlawful under the Administrative

Procedure Act (APA).

  2. The Administrator's decision is unlawful for at least three separate reasons.  First,

the agency unlawfully excluded from the "apportionment ratio" used to determine Medica's

reimbursable costs certain charges on claims for physician services that were correctly paid by

Medica but also separately (and erroneously) paid by a Medicare Administrative Contractor

(MAC).  The disputed claims—referred to herein as "MAC/Medica claims" —were for covered

services furnished to Medicare cost plan enrollees.  As this Court has already found, CMS is thus

required by the plain language of its own regulations to include the charges on these claims in

the apportionment ratio used to determine Medica's reimbursable costs.  *See Medica Ins. Co. v.*

*Becerra*, 2023 WL at 6314571.

  3. The Administrator also erred by overturning a hearing officer's determination that

CMS acted unlawfully in deciding to extrapolate purported Medicare claim errors to the entire

universe of Medica's Medicare claims.  There were two components to the Administrator's

extrapolation decision that were unlawful:  First, the Administrator erred in finding that Medica

waived challenges to specific claim errors flagged by the CMS auditors.  And second, the

Administrator erred in permitting the agency to confine sampling and extrapolation of errors

only to *Medicare* claims, and not performing parallel actions on *non-Medicare* claims.  Because

that skews the apportionment ratio, the Administrator's decision was arbitrary, capricious, and

otherwise unlawful.

  4. Finally, the agency erred in applying sequestration cuts to Medica's year-end cost

plan reimbursement rather than to individual payments to physicians for services, as required by

the plain language of the sequestration statute.  That had the effect of reducing Medica's cost

plan reimbursement for sequestration twice, in conflict with the statute.

5. For all these reasons, CMS's decision should be vacated and declared unlawful.

## PARTIES

6. Plaintiff Medica Insurance Company is a health insurance company serving

patients living in Minnesota and neighboring Midwestern states.  Originally founded in 1975,

Medica has grown to become one of the largest health insurers in the Upper Midwest.  Its

insurance offerings are designed to serve individuals of all ages and life stages—including cost-

plan-enrolled Medicare beneficiaries.  Medica is headquartered in the State of Minnesota and has

its principal place of business at 401 Carlson Parkway, Minnetonka, MN 55305.

7. Defendant Xavier Becerra is the Secretary of Health and Human Services.

Defendant Becerra maintains an office at 200 Independence Avenue, S.W., Washington, D.C.

20201.

## JURISDICTION AND VENUE

8. Jurisdiction in this Court is grounded upon and proper under 28 U.S.C. § 1331, in

that this civil action arises under the laws of the United States; 28 U.S.C. § 1346, in that this case

involves claims against the federal government; 28 U.S.C. § 1361, in that this is an action to

compel officers of the United States to perform their duty; and 28 U.S.C. §§ 2201–2202, in that

there exists an actual justiciable controversy as to which Plaintiff requires a declaration of its

rights by this Court and injunctive relief to prohibit Defendant from violating laws and

regulations.  Judicial review is available under 42 U.S.C. § 1395oo(f)(1).

9. Venue is proper in this Court under 42 C.F.R. § 405.1877(e)(1), which permits

venue in this district, and under 28 U.S.C. § 1391(b) and (e) because this is a civil action in

which Defendant is an officer of the United States acting in his official capacity and Defendant

maintains his office and conducts business in this judicial district.

## FACTUAL BACKGROUND

**Statutory and Regulatory Background**

10.     The Medicare program, enacted in 1965, provides health insurance for individuals

65 years of age and older, some individuals with disabilities under age 65, and individuals with

certain conditions such as end-stage renal disease.

11.     Medicare fee-for-service (FFS) is delivered through two different insurance

programs, Part A (hospital insurance) and Part B (physician and supplier insurance).  Relevant to

this dispute is Medicare Part B, which covers enrolled beneficiaries for, in pertinent part, items

and services furnished by physicians and other non-hospital health care suppliers.

12.     Medicare cost plans have existed since the 1970s.  The Medicare statute requires

CMS to reimburse cost plans on a cost basis, rather than a per capita or other measure of

payment.  There are only nine Medicare cost plan contracts in existence nationwide, and the

Medicare statute prohibits creation of any additional ones.  These cost plans overwhelmingly

serve rural and other under-served regions where few or no other Medicare managed care options

(e.g., Medicare Advantage) exist.  Cost plans can provide covered Part B services to Medicare

beneficiaries either directly or through contractual arrangements with third party physicians and

suppliers.

13.     Medica contracts with physicians to provide its Medicare beneficiary cost plan

members with coverage for the full range of Medicare Part B covered services (e.g., physicians'

services, X-rays), as well as supplemental benefits that would not normally be covered by

Medicare FFS.

14.     As a cost plan, Medica is entitled to be reimbursed for its reasonable costs associated with running with the Medicare cost plan.  These costs include not only the costs associated with paying physicians and suppliers for the care provided to enrollees, but also Medica's general and administrative costs, such as the costs of its employees, office space, purchasing or renting equipment, and running the claims processing software.

**The Apportionment Ratio**

15.     Like all companies that operate cost plans, Medica also has other non-Medicare lines of business.  Its general and administrative expenses are typically spread across all portions of the company's business, including non-Medicare lines of business.

16.     It was important to Congress that CMS spell out the methods to be used for calculating "reasonable costs" through notice-and-comment rulemaking.  By statute, reasonable costs must "be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services."  SSA § 1861(v)(1)(A); 42 U.S.C. § 1395x(v)(1)(A).

17.     The statute goes on to specify in detail what the agency must consider in promulgating those regulations, and what the resulting regulations may contain.  *Id.*  Among other things, Congress specified that the regulations "may provide for determination of the costs of services on a per diem, per unit, per capita, or other basis, may provide for using different methods in different circumstances, [and] may provide for the use of estimates of costs of particular items or services."  *Id.*

18.     The statute also required that the regulations "take into account both direct and indirect costs . . . in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs

established by this title will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs." *Id*.

19.     The statute reflects the clear and unmistakable intent of Congress that CMS not be permitted to freewheel its decisions on the methodologies used to calculate "reasonable costs," but rather must specify them in advance through regulation.

20.     In keeping with this statutory mandate, CMS issued a series of regulations binding itself to an "apportionment" method for determining reasonable costs.  For physician and supplier services, the apportionment ratio is a fraction, with the numerator comprised of the charges (i.e., what the physician charged, not what the cost plan paid) for covered services furnished to *Medicare* enrollees in the cost plan, and the denominator comprised of the total charges for services furnished to *all* enrollees in the plan.  *Id.* § 417.560(c).  CMS then multiplies that fraction by all of the costs the organization incurs (with limited exceptions not relevant here).  *Id.*  CMS's apportionment regulation creates a statistical proxy designed to estimate that share of the total cost for physician and supplier services attributable to Medica's cost plan enrollees.

21.     CMS then uses that same apportionment ratio to calculate the share of Medica's general and administrative costs associated with its cost plan enrollees.  42 C.F.R. § 417.564(b).

22.     The apportionment ratio thus is used to estimate the percentage of the company's reasonable costs (including the company's shared general and administrative costs) attributable to Medicare cost plan beneficiaries.

**Medica's Claim Processing Procedures**

23.     Medica has contracts with a large number of physicians, who provide in-network Part B covered services to Medica cost plan enrollees "under arrangements" with Medica.  These

6

physicians bill Medica on a FFS basis.  When a cost plan enrollee receives care from an in-network physician, the doctor's billing office sends a claim to Medica.  Medica's claim processing system adjudicates that claim by (i) determining the appropriate payment rate based on the physician contract, (ii) calculating the patient deductible or cost-sharing based on the enrollee's claim history and plan details, and (iii) marking the claim for payment.

24.     As part of the same process, the system also creates an Explanation of Benefits (EOB), which provides the enrollee with information about the date of service, the type of service, physician name, physician charge, contractual payment rate, co-pay or deductible, progress toward annual cost sharing requirements, amount of Medica payment to physician, and amount due the physician by the patient.

25.     It would be physically impossible—as well as inadvisable from a fraud control perspective—for Medica to generate an EOB without processing the claim and paying any amounts still due the physician.

**MAC/Medica Claims**

26.     Sometimes, a physician erroneously bills a MAC for claims that are Medica's responsibility, because they were for covered services furnished to Medica cost plan enrollees. In such circumstances, the MAC apparently pays those claims without regard to whether Medica is legally obligated to pay the claim instead.  Medica refers to such claims internally as "Medicare Paid in Error," or "MPIE." [1]  For present purposes, they will be referred to as "MAC/Medica claims."

---

[1] The term "MPIE" is also used by CMS at points in the administrative record.  CMS now disputes that these claims were paid by the Medicare contractor "in error," but whether true or not, that would have no impact on the legal issues in dispute.

27.     The MAC lacks information about the contractual payment amount due the physician for covered services under Medica's contract, so instead of paying the correct amount due, the MAC instead pays the Medicare FFS amount, minus a presumed 20% co-pay applicable under FFS (but not applicable to enrollees in Medica's cost plan).

28.     Once every week or so, CMS sends cost plans a crossover report, which allows Medica to determine those claims that were inappropriately paid by a MAC.

29.     Sometimes MAC/Medica claims come about because the physician sends identical bills to both Medica and the MAC.  By statute, the MAC is prohibited from paying claims until at least 14 days after receipt of the claim.  42 U.S.C. §§ 1395u(c)(3)(A), (B).  Medica often processes its claims more quickly than that.  In these cases, Medica processes and pays the claim before the MAC does.

30.     More commonly, MAC/Medica claims arise because the physician erroneously bills only the MAC, which pays the claim and lists it on the crossover report.  After reviewing the crossover report, Medica processes the MAC/Medica claims in its own payment system in order to correct the inaccurate MAC payment and Medicare beneficiary's co-pay or deductible and to generate an EOB for the patient's records.  In processing the claim, Medica (i) determines the correct amount due the physician under Medica's contract with the physician, (ii) calculates the co-pay, deductible, or co-insurance due from the patient, (iii) recoups the erroneous MAC payment, (iv) processes the payment to the physician at the correct payment amount, after factoring in the correct patient contribution, and (v) gives the patient credit toward any annual deductible or co-payment obligation.

31.     Medica has no choice but to make these payments.  Medica (and not the MAC) is the only entity of the two that actually knows how much the physician is contractually required

to be paid.  Medica is contractually bound to make payments to physicians in accordance with its contracts.  But more importantly, Medica is the only entity that knows how much the Medicare enrollee owes by way of coinsurance, deductible, or copayment, and whether any annual limits have been met.  Moreover, Medica is the only entity that can (and does) generate an EOB and transmits it to the patient.  If Medica did not process the claim and correct the payment amount, it would create inaccuracies in what Medicare ultimately pays, what the Medicare beneficiary contributes, and what the physician receives.  The patient would not receive an EOB, and there would be no way to track the Medicare patient's copayments and deductibles over time.  *See also* Medicare Managed Care Manual, Ch. 17 § 40.1, citing 42 C.F.R. § 417.454.  The result would be an administrative mess that would harm Medicare beneficiaries, physicians, and Medicare itself. Medica's processing of MPIE claims is necessary to establish Medicare patients' correct copayment or deductible amounts (and not more, as often happens when the MAC pays).  For this reason, Medica is required by law to pay all claims for physician services furnished to its Medicare enrollees.  *See, e.g.*, SSA §  1876(c)(2)(A), 42 U.S.C. § 1395mm(c)(2)(A); 42 C.F.R. § 417.414(b).

32.     During the cost plan years at issue, CMS was far from the model of clarity regarding its view of how MAC/Medica claims should be treated on the cost reports.  For 2012 and most of 2013, the agency was completely silent on the issue.

33.     In an August 2013 guidance memo, the agency said that the apportionment statistics should exclude claims "processed by MACs."  But that memo does not shed any light on the issues in dispute here.  The memo addresses the situation where the MAC is the only entity that processes and pays a claim.  It says nothing about claims that are erroneously sent to and processed by the MAC but that are also correctly processed and paid by the cost plan.  As a

result, no regulated entity would have reasonably understood the memo to apply to claims actually processed and paid by the cost plan.  And of course, an August 2013 memo could not have provided sufficient notice to cost plans during much of the time period relevant here.

34.     It was not until three years later, on June 30, 2016, that CMS sent Medica an email more clearly stating that the "statistics associated with [MAC/Medica] claims should not be included in your apportionment statistic."

**Sequestration**

35.     In 2011, Congress passed a statute mandating sequestration—automatic spending cuts accomplished through cuts to government programs—to be effective in 2013.  The Medicare sequestration provision required a two percent reduction to be applied to "individual claims for services" furnished under Medicare Parts A and B.  *See* 2 U.S.C. § 906(d) (noting that sequestration shall apply "in the case of parts A and B of [the Medicare Act], to individual payments for services furnished during the one-year period . . . .").

36.     Medica complied with this requirement by reducing payments on claims from physicians and suppliers for items and services furnished to its cost plan enrollees by 2%, as contemplated by the plain language of the statute.

**CMS's Notice of Program Reimbursement and the Ensuing Audit Process**

37.     Like all cost plans, Medica prepares and submits a cost report to CMS annually, after the end of the cost year.  In its cost reports for the years in dispute, Medica included a line-item adjustment on the settlement sheet (Worksheet M) in order to return to CMS the funds Medica had recouped from physicians on CMS's behalf in connection with MAC/Medica claims. In addition, Medica included the physician charges associated with the corresponding claims that Medica properly paid in both the numerator and denominator of the apportionment statistic.

10

38.     In May 2020, CMS issued a Notice of Program Reimbursement (NPR) for Medica's 2012 and 2013 cost years.  In each NPR, CMS removed MAC/Medica claims from the apportionment ratio for Medica's cost reports.  In essence, CMS has taken the position that Medica should simply ignore physician charges for claims that have been processed by both Medica and a MAC and exclude them from the apportionment ratio.  That proposal is deceptively simple-sounding, but it results in significant under-reimbursement to Medica.

39.     CMS also took the position that Medica's reimbursement should be reduced to account for purported claim errors that the agency's auditors had flagged during the audit process.  Under a process known as "extrapolation," the auditors had sampled hundreds of claims, reviewed them for error, and extrapolated the resulting error rate across all of Medica's Medicare claims.  Many of the "errors" flagged by the auditors were not in fact errors: Sometimes the auditor thought a physician signature was missing, when the signature was, in fact, in the medical record.  Other times, the auditor misunderstood the nature of a medical procedure.  During the audit process, Medica had disputed the auditor's position on the vast majority of the claims, providing the auditor (and the agency) with a detailed explanation for why it disagreed with the auditor's position.

40.     Although Medica had provided the auditors with a "data dump" containing all of the claim files for all of the non-Medicare claims, the agency refused to sample and extrapolate the *non*-Medicare claims, which would have ensured that the apportionment ratio was not skewed by asymmetrical treatment of the numerator and the denominator.  As a result of the agency's error, the numerator of the apportionment ratio was disproportionately reduced during the extrapolation process.

41.     The agency also reduced Medica's reimbursement for 2013 by applying a two percent cut to Medica's year-end cost reimbursement, purportedly to implement sequestration. But Medica had already implemented sequestration by reducing the payments it made on claims from physicians and suppliers for items and services furnished to its cost plan enrollees by 2% through the year.  Medica did so to faithfully implement the sequestration statute, which requires the reduction to be applied to "individual claims for services" furnished under Medicare Parts A and B.  *See* 2 U.S.C. § 906(d) (noting that sequestration shall apply "in the case of parts A and B of [the Medicare Act], to individual payments for services furnished during the one-year period . . ."). CMS's additional 2% at the end of the cost year had the effect of reducing Medica's total reimbursement twice, resulting in an unlawful additional disallowance of $2,745,884.

42.     Cumulatively, CMS's errors reduced reimbursement to Medica, to the tune of millions of dollars a year.  Medica timely appealed in October 2020.

**The Hearing Officer's Decision**

43.     The dispute went to an administrative hearing in front of a CMS Hearing Officer, who held a multi-day evidentiary hearing on the disputed issues.  By the time of the hearing, the parties had narrowed the number of disputed claims down to seven, settling the remainder.

44.     With regard to MAC/Medica claims, the Hearing Officer split the baby.  For the 2012 cost plan year, the Hearing Officer found that "the clearest reading of the 42 C.F.R. § 417.560(c) formula is that the claims at issue"—i.e., the MAC/Medica claims—"should be included within the apportionment ratio."   For the 2013 cost plan year, however, the Hearing Officer decided that the regulation "may be fairly and reasonably read in conjunction with the subregulatory guidance conveyed by the 2013 cost report instruction."  As a result, the Hearing Officer excluded MAC/Medica claims from the apportionment ratio for the 2013 cost plan year.

12

45.     With respect to seven claim review determinations, the Hearing Officer issued a split decision.  The Hearing Office found that CMS properly adjusted two claims (Claim 2012-69 and Claim 2012-300) while overturning CMS's determinations as to the five other claims (Claim 2012-70, Claim 2012-198, Claim 2013-7, Claim 2013-63, and Claim 2013-351).

46.     The Hearing Officer also found that CMS's adjustment applying an additional 2% sequestration to the already-reduced payments made by Medica should be reversed, but only for claims paid before December 11, 2013 (the date on which CMS issued its guidance on the issue).

**The Administrator's Decision**

47.     On her own initiative, the CMS Administrator undertook review of the Hearing Officer's decision.  On review, the Administrator overturned all the portions of the Hearing Officer's ruling that found for Medica.

48.     With respect to the MAC/Medica claims at issue, the CMS Administrator concluded that if Medicare "directly incurs the cost of service furnished to the Medicare enrollee through the payment of the claim by the carrier," then Medica "should not include statistics for those services in its apportionment calculations."  Administrator Decision at 17.  To bolster this conclusion, the Administrator—invoking statutory language about the general purposes of Medicare cost plans—took the position that the administrative costs that Medica admittedly incurred in processing and paying the MAC/Medica claims were "unnecessary," because it was not "efficient" that the claims had to be processed by both the MAC and Medica.  Administrator Decision at 11.

49.     The Administrator also reversed the Hearing Officer's decision on extrapolation, asserting that the seven individual claims challenged in the proceeding were not timely raised.  The Administrator asserted that "an initial hearing request must describe each issue in detail for

each specific item under appeal." Administrator Decision at 28. In support of this position, the Administrator cited regulations governing Provider Reimbursement Review Board appeals. 42 C.F.R. § 405.1835. The Administrator also reversed the Hearing Officer's decision that CMS acted arbitrarily in sampling and extrapolating error rates across Medicare claims, but not non-Medicare claims.

50.     Finally, the Administrator reversed the Hearing Officer's decision regarding sequestration, finding that the agency was permitted to apply another 2% cut to Medica's year-end calculation of cost reimbursement, on top of the 2% reduction that Medica applied to the payments for individual physician services throughout the year.

## THE ADMINISTRATOR'S DECISION IS UNLAWFUL

**MAC/Medica Claims**

***Violation of the Agency's Regulation***

51.     The agency's position on MAC/Medica claims is unlawful, several times over. First, CMS's apportionment regulation expressly requires CMS to include "charges for covered services furnished to Medicare enrollees" in both the numerator and the denominator of the apportionment ratio. 42 C.F.R. § 417.560(c).

52.     On two occasions, this Court has agreed. In *Medica Ins. Co. v. Becerra*, No. 1:22-cv-1440-RCL, 2023 WL 6314571, (D.D.C. Sept. 28, 2023), the Court embraced Medica's reading of 42 C.F.R. § 417.560(c), holding that "[t]he text of the Regulation, read in context, clearly permits carrier-paid claims to be included in the apportionment ratio." *Id.* at *6. The Court adopted that same interpretation in *Scott & White Health Plan v. Becerra*, No. 1:22-cv-3202 (CRC), 2023 WL 6121904 (D.D.C. Sept. 19, 2023), which explained that "the Court is

14

assured that the regulation permits HMOs to include carrier-paid claims in its apportionment ratio." *Id.* at \*10.

53.     Notably, the apportionment regulation imposes no qualifications on the phrase "covered services furnished to Medicare enrollees."  *See* 42 C.F.R. § 417.560(c).  The portion of the regulation addressing the apportionment ratio says nothing about who paid the claim, nor does it allow for the possibility of excluding from the ratio claims that are processed and paid by both a cost plan and a MAC.  And tellingly, the relevant touchpoint in the regulation is the physician charge, not the payment amount, so by definition the sole focus must be on the amount charged by the physician, not the particularities of payment.

54.     To get around this problem, the Administrator cited to another inapplicable regulation, 42 C.F.R. § 417.556(d), which she characterized as providing that "[i]f the HMO or CMP elects to have providers reimbursed by the HMO's or CMP's Medicare intermediary, the Medicare share is the amount the intermediary paid the provider."  Administrator Decision at 12.  But that regulation applies only to "providers," and thus is inapplicable to the present claims, which involve physicians and suppliers.  *See* SSA § 1861(u) and (d); 42 U.S.C. 1395x(u) and (d) (definitions of "provider" and "supplier"); 42 C.F.R. § 400.202 (defining "provider" to mean a hospital and certain other institutional health care facilities, while defining "supplier" to mean "a physician or other practitioner, or an entity other than a provider, that furnishes health care services under Medicare."); *compare id.* §§ 417.544–417.546, 417.560 (apportionment rules for Part B physician and supplier furnished services) *with id.* §§ 417.554–417.556 (apportionment rules for provider furnished services).

55.     The District Court for the District of Columbia has explained that this provider regulation is the "wrong regulation" for interpreting the cost plan apportionment rules that govern

Part B reimbursement for physician and supplier services. *Scott & White Health Plan v. Becerra*, No. 22-cv-3202 (CRC), 2023 WL 6121904, at *13 (D.D.C. Sept. 19, 2023). There, when invoking 42 C.F.R. § 417.556(d), "the Administrator reiterated that this calculation was 'directly contrary to the method set forth in the scenario covered at 42 C.F.R. § 417.556(d),' again relying on the wrong regulation." *Scott & White Health Plan*, 2023 WL 6121904, at *13. Rather than attempting to correct course in light of the Court's ruling, the Administrator doubled down and used the *exact same reasoning* to support her decision in this proceeding—repeating that "[t]his would be directly contrary to the method set forth in the scenario covered at 42 C.F.R. § 417.556(d)." Administrator Decision at 17 n.25.

56.     This was no stray reference.   The Administrator reprised CMS's mistaken reliance on the provider regulation in other ways, too, parroting the same language this Court had already explained was misguided because it relied on the wrong regulatory authority and "conflated the regulations." *Compare* Administrator Decision at 17 *with Scott & White Health Plan*, 2023 WL 6121904, at *13. In sum, "the Administrator did not just cite the wrong rule in passing." *Id.* Instead, the Administrator "cited, quoted, and relied on that regulation multiple times in the most important part of the decision." *Id.* That was unlawful.

### CMS Failed to Comply with Notice-and-Comment Rulemaking

57.     CMS also violated the Medicare statute by failing to engage in notice-and-comment rulemaking to promulgate the accounting method it espouses here, which it announced to Medica through informal e-mails and letters (and eventually, through agency guidance).

58.     The Medicare statute mandates that reasonable costs "be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and

16

services." SSA § 1861(v)(1)(A); 42 U.S.C. § 1395x(v)(1)(A). The statute goes on to specify in detail what those regulations must contain. *Id.* The statute reflects the clear and unmistakable intent of Congress that CMS not be permitted to freewheel its decisions on the methodologies used to calculate "reasonable costs."

59. Separate and apart from that provision, the Medicare Act also contains another rulemaking provision pursuant to which even CMS's non-binding interpretive rules must undergo notice-and-comment rulemaking. SSA § 1871(a); 42 U.S.C. § 1395hh(a). The Medicare Act's rulemaking requirement applies to all requirements and statements of policy (other than national coverage determinations) that govern "payment for services" under the Medicare Act. And as the Supreme Court noted in *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1814 (2019), there is no interpretative rule exemption to the Medicare Act's rulemaking requirement.

60. *Allina*'s holding applies here, as this Court has found. "When CMS did attempt to implement this policy, it failed to do so through the required notice-and-comment procedure." *Medica Ins. Co.*, 2023 WL 6314571, at *13. Under *Allina*, that is unlawful. *Id.* ("CMS violated the Medicare Statute by attempting to banish carrier-paid claims from the apportionment ratio without notice-and-comment rulemaking.").

### The Administrator's Position Is Arbitrary and Capricious.

61. The Administrator's decision is also arbitrary and capricious, for multiple reasons.

62. As noted above, there is no logical basis for refusing to reimburse Medica for its general and administrative expenses associated with processing MAC/Medica claims. Processing these claims is a necessary and appropriate function of the cost plan, and is done to ensure that its enrollees are getting the services, with commensurate cost-sharing obligations that

they are contractually entitled to receive, from physicians who are contractually entitled to accurate payments.

63.     The Administrator's decision also is arbitrary and capricious because it reflects an abrupt change in position without adequate explanation.  For years, CMS *required* Medica to recoup any inaccurate payments by the MAC.  Yet without acknowledgment of the change in position, the Administrator abruptly asserted that cost plans were *prohibited* from recouping erroneous payments.  That is arbitrary and capricious.

64.     The Administrator's decision is arbitrary and capricious for another reason as well:  It purports to blame Medica for physician billing errors.  The Administrator argued:  "The Plan has the responsibility, not CMS, as a condition of the Plan participation, to resolve the double billing with its contracted providers/physicians. The Plan is the entity with the contractual relationship/control through an agreement with the billing physicians to provide HMO services, not CMS."  Administrator Decision at 18.  It is unclear what the Administrator means by "resolve."  To the extent that language suggests that Medica should have prevented the physician error in the first place, the Administrator fails to identify anything specific that Medica was required to do that it did not.  That failure was arbitrary and capricious.

### *CMS's Position Violates Basic Principles of Fair Notice and Due Process.*

65.     For the reasons stated above, Medica believes that CMS's new position is unlawful, full stop.  But at the very least, CMS's retroactive application of its new policy to the cost years at issue violates basic principles of fair notice and due process.

66.     Nowhere in CMS's regulations, guidance documents, manuals, or other public statements has the agency provided regulated entities with notice that they should exclude

physician charges associated with MAC/Medica claims from their apportionment ratio, thus altering the amount of cost reimbursement.

67.     The closest the agency ever came to addressing the issue was in a 2013 guidance memo, in which it said that the apportionment statistics should exclude claims "processed by MACs."  But that memo says nothing about claims that are erroneously processed by the MAC but that are *also* correctly processed and paid by the cost plan.  And of course, a 2013 memo could not have provided sufficient notice to cost plans during 2012.

68.     No statute or regulation authorizes—let alone clearly mandates—the policy that CMS has espoused here.  In addition, CMS has not identified any guidance, manual, or other public pronouncement that would have put a cost plan on public notice that claims actually paid by the cost plan but also erroneously paid by a MAC would be excluded from the apportionment ratio.  Certainly Medica could not have predicted that CMS would penalize cost plans for mistakes made by CMS's own contractors.

69.     CMS's failure to provide Medica with fair notice of its new policy before applying it to Medica violates basic principles of fair notice and retroactivity.  *See General Elec. Co. v. EPA,* 53 F.3d 1324, 1329 (D.C. Cir. 1995); *Retail, Wholesale and Dep't Store Union, AFL-CIO v. NLRB,* 466 F.2d 380 (D.C. Cir. 1972).

70.     The Administrator completely failed to address this issue anywhere in her decision.  That too was arbitrary, capricious, and unlawful.

**Extrapolation**

71.     CMS also erred in extrapolating purported payment errors in a number of sampled Medicare claims to all Medicare claims paid by Medica.

72.     First, the Administrator erred in finding that the seven individual claims challenged in the proceeding were not timely raised.  Citing a regulation governing Provider Reimbursement Review Board (PRRB) appeals that is not directly applicable here, the Administrator asserted that "an initial hearing request must describe each issue in detail for each specific item under appeal."  Administrator Decision at 28, citing 42 C.F.R. § 405.1835.  The Administrator next found that parties must add "specific Medicare payment issues" to the hearing request within 60 days of the expiration of the appeal period.  The Administrator missed an obvious point—Medica *did* raise the specific appeal issue challenging the underlying claim decisions in its notice of appeal.  As a result, any purported deadline for adding issues to the appeal notice is simply irrelevant.

73.     Moreover, CMS has been on notice of the underlying claims disputed by Medica—and the basis for its dispute—since the audit process underlying this appeal.  During the audit, the parties exchanged excel spreadsheets describing their positions on the sampled claims.  In addition, Medica supplied the auditors, Peak and Kearney, with documents from the underlying claim files to demonstrate that the claims were appropriately paid.  Peak and Kearney relied on and quoted from those medical claim files in rendering their decisions on the claims during the audit process.  Medica then announced its challenge to the underlying medical claims as the very first issue in its October 2020 appeal letter—in a manner that would more than satisfy the notice pleading standards for dispute resolution.

74.     At the time it noticed the appeal, Medica was challenging all of the claims flagged by the auditor as erroneous.  In the interest of streamlining the issues in dispute, the parties conferred at various points during the appeal to narrow the claims in dispute.  By the time the claims were submitted to the Administrator, the parties had narrowed the disputed claims to

seven.  Those seven claims were then the subject of extensive factual and expert testimony at a

multi-day hearing.

75.     What the Administrator really seems to be saying is that Medica should have been

required to narrow its disputed claims and provide more details about the specific basis for its

claim challenges in the appeal notice.  That is not how the appeal process works—even under the

PRRB rules.  In any event, those regulations do not readily apply to the procedures governing

cost plan appeals.  The PRRB rules contemplate a discovery process that was not followed here,

and they also mandate a joint compilation of the record that did not occur here (and that CMS

never proposed to follow).  *See* 42 C.F.R. § 405.1853.

76.     Ironically, the agency had previously argued that Medica was required to describe

its claims in its position papers—not the initial appeal letter.  But the cost plan appeal process did

not involve submission of position papers.  Under the PRRB rules, position papers are filed by

parties to a board hearing only after the parties meet and confer in an attempt to narrow the

issues in dispute and then submit joint stipulations of fact and a joint record.  42 C.F.R.

§ 405.1853(a).  None of that happened here.  The agency seems to argue for applicability of the

PRRB rules when it feels like it, and ignore them when it doesn't.

77.     The Administrator's position works an egregious unfairness on Medica.  The

parties met and conferred about the case schedule in December 2020, and CMS never raised any

concerns about the specificity of the claims being appealed at that time.  Nor did the agency

propose the discovery process and joint compilation of the record that would have been

applicable if the PRRB rules governing submission of evidence applied to the claims challenge.

*See* 42 C.F.R. § 405.1853.  However, CMS did include in the Hearing Appeal File a number of

summary excel documents that explained—in vivid detail—Medica's arguments relating to the

disputed claims from the audit process.  Thus, CMS was well aware of Medica's position on each disputed claim, both during the underlying audit and throughout the appeal.

78.     The position now espoused by CMS—that Medica was required to narrow its claims earlier and submit all evidence and arguments supporting each claim in the initial appeal notice—is absurd.  This is especially true given that there are no deadlines spelled out in the cost plan appeal rules or the hearing officer's case schedule.  The Administrator's position is so egregiously unfair that it would constitute a blatant violation of Medica's due process rights if it were to come to fruition.

79.     The Administrator erred on extrapolation for another reason as well.  CMS's extrapolation methodology was unlawful because its auditor sampled and extrapolated to only *Medicare* claims.  Although the agency's auditors had access to all of the *non-Medicare* claim files, it refused to sample and review them for error.  In doing so, CMS and its auditor arbitrarily skewed the apportionment ratio used to calculate Medica's cost reimbursement.

80.     The agency's policy limiting extrapolation to Medicare claims is a new one. Historically, CMS had advised its contractors that both Medicare and non-Medicare claims must be reviewed.  The agency has not supplied a reasoned basis for reversing this historical policy now.  That failure renders its current position arbitrary and capricious.  *See American Wild Horse Preserv. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017); *Lone Mountain Processing, Inc. v. Secretary of Labor*, 709 F. 3d 1161, 1164 (D.C. Cir. 2013).

81.     In addition to being arbitrary and capricious, the agency's conduct also violates the statutory prohibition on cross-subsidization.  SSA § 1861(v)(1)(A); 42 U.S.C. § 1395x(v)(1)(A).

82.    Medica also continues to challenge the auditor's identification of errors on the seven claims that remain in dispute.  The hearing office found in Medica's favor on five of the seven claims.  The Administrator reversed that decision—purportedly on timeliness grounds, as explained above—but Medica continues to believe that all seven claims contested at the hearing were erroneously flagged by the auditor as improperly paid.  These claims include:

- **Claim 2012-69:**  Claim 2012-69 involved a bronchoscopy of the lung and related lymph node biopsy performed at the Mayo Clinic.  The procedure was billed to Current Procedural Terminology (CPT) code 31629, which describes "Bronchoscopy, rigid or flexible, including fluoroscopic guidance, when performed; diagnostic, with cell washing, when performed (separate procedure) with transbronchial needle aspiration biopsy(s), trachea, main stem and/or lobar bronchus."  In rejecting the claim, CMS's contracted auditor asserted that the medical record was unclear as to whether "the biopsy was obtained via needle aspiration, or that it was transbronchial (through the bronchus)."  The medical records and expert testimony before the Hearing Officer clearly established that the code was appropriate.

- **Claim 2012-70:**  Claim 2012-70 relates to an excision of an intracardiac tumor.  It was billed to CPT code 33120, which describes "[e]xcision of intracardiac tumor, resection with cardiopulmonary bypass."  The claim was also billed with modifier -22, which is applicable "[w]hen the work required to provide a service is substantially greater than typically required." In rejecting the claim, CMS's audit contractor asserted that there was inadequate documentation of substantial additional work to support use of modifier -22.  As the hearing officer correctly found, the expert testimony and medical records presented at the hearing more than adequately established the complexity of the procedure necessitating use of the modifier.

- **Claim 2012-198:** Claim 2012-198 involved a nerve conduction study. In rejecting the claim, the contractor asserted that no electronic signature was included on the claim. The medical record includes an electronic signature with the physician's name and the symbol "/st/pp". In addition, the record indicates that the record was "Signed By" the administering physician, Dr. Xiaming Dong. The hearing officer correctly found that these actions constitute a valid signature.

- **Claim 2012-300:** Claim 2012-300 involved a 90 unit injection of XIAFLEX® (collagenase clostridium histolyticum). The code for the drug reflects that each unit is "0.01 milligrams," thus the claim was for 0.9 milligrams. The auditor objected to the claim because it believed there may be evidence that two 90 unit injections were given. But the physician billed for a 90 unit injection, and Medica paid for the 90 unit injection. There is clear record evidence to support this payment. The possibility of a second 90 unit injection in a different location is not relevant to whether there is record evidence supporting the 90 unit injection that was indisputably given and actually paid by Medica.

- **Claim 2013-7:** Claim 2013-7 involved anesthesia services for a permanent transvenous pacemaker insertion. In rejecting the claim, CMS's contractor initially asserted that it was unable to determine the correct units of anesthesia start and stop time. But as the hearing officer correctly found, the medical records and expert testimony at the hearing more than adequately support at a minimum the 111 minutes of billed anesthesia time.

- **Claim 2013-63:** Claim 2013-63 involved surgery to correct three metatarsal deformities. It was billed under CPT code 28270, which describes "Capsulotomy; metatarsophalangeal joint, with or without tenorrhaphy, each joint (separate procedure)." Modifier 59 is used to denote when the procedure is "carried out independently, considered

unrelated or distinct from other procedures or services provided at that time."  In rejecting the claim, the auditor asserted that the patient appears to have had a "hammer-toe deformity" and that use of modifier -59 is not appropriate to unbundle a capsulotomy from "the codes for repairing the hammertoes via osteotomy and excision of bone."  The hearing officer correctly found that the medical record and expert testimony established that the procedure involved correction of deformities in three different metatarsals, and thus that the modifier was appropriate.

- **Claim 2013-351:**  Claim 2013-351 involved an intravesical injection of VALSTAR® (valrubicin), a chemotherapy drug.  CMS's auditor appears to have objected on the grounds that it did not believe there was adequate documentation for the 800 mg of VALSTAR® billed by the physician.  But as the hearing officer correctly noted, the medical record states that a "full dose" was administered.  Consistent with the FDA label, a full dose of VALSTAR® is 800 mg.  Further, the physician's note clarifies that the full dose administered was "4 vitals." This was clearly a scrivener's error, as CMS's own expert conceded; the physician is obviously stating that he administered 4 vials, which he describes as a "full dose" because VALSTAR is supplied in 200 mg vials.

#### Sequestration

83.     Finally, CMS acted unlawfully by applying sequestration cuts to Medica's reimbursement in cost year 2013 in a manner that inappropriately reduced payments to Medica. CMS's position is unlawful, for at least two separate reasons.

84.     First, the statutory provision implementing Medicare sequestration requires a sequestration reduction to be applied to "individual claims for services" furnished under Medicare Parts A and B.  *See* 2 U.S.C. § 906(d) (noting that sequestration shall apply "in the

case of parts A and B of [the Medicare Act], to *individual payments* for *services furnished* during the one-year period . . .") (emphases added).  The plain language of the statute thus evinces Congress's clear intent to limit Part A and B sequestration reductions solely to payments for "individual claims"—i.e., claims from physicians, providers, and suppliers—not to payments to cost plans.

85.    Medica complied with this requirement by reducing payments on claims from physicians and suppliers for items and services furnished to its cost plan enrollees by 2%.  CMS then reduced that already-reduced amount by an *additional* 2% at the end of the cost year, resulting in an additional disallowance of $2,745,884.  This had the effect of reducing Medica's total reimbursement twice.

86.    That is unlawful for at least three reasons.  First, Congress expressly chose to apply sequestration to "individual payments for services furnished."  *See* 2 U.S.C. § 906(d).  CMS lacks the statutory authority to apply sequestration cuts to cost plans like Medica.

87.    Second, CMS's implementation of the sequestration statute results in Media suffering from more than the statutory 2% payment reduction.  By cutting an additional 2% on top of the 2% cut that Medica implemented based on the plain language of the statute, CMS is close to doubling the effect of the sequestration.  That is impermissible under the statute.

88.    The agency's position is unlawful for a separate reason as well:  CMS failed to provide adequate and timely notice of its desired methodology for implementing sequestration.  The sequestration statute took effect as of April 1, 2013, and CMS ordered plans to begin implementing sequestration as of that date.  But CMS did not develop specific instructions for implementing sequestration until more than eight months later, on December 11, 2013.  That was the first time the agency informed cost plans that the sequestration cuts should be applied to the

cost plan's year-end payment, not to individual physician payments.  By that point, Medica had already applied the 2% reduction to every single individual claim submitted by physicians throughout the preceding months.  Even if CMS's approach to sequestration were otherwise proper, CMS's attempt to apply its sequestration policy retroactively to the beginning of 2013 violates basic principles of fair notice and retroactivity.  *See General Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995); *Retail, Wholesale and Dep't Store Union, AFL-CIO v. NLRB*, 466 F.2d 380 (D.C. Cir. 1972).

## COUNT I
### (Administrative Procedure Act, 5 U.S.C. §§ 700, *et seq.*)

89.     Medica re-alleges and incorporates by reference the allegations in the foregoing numbered paragraphs.

90.     The APA prohibits CMS from carrying out the agency's statutory and regulatory duties in a manner that is unlawful, arbitrary, capricious, an abuse of discretion, or contrary to a constitutional right.  *See* 5 U.S.C. § 706(2).

91.     The agency's treatment of MAC/Medica claims violates its own regulations. Because the disputed claims were for covered services furnished to Medicare enrollees, CMS is required by the plain language of its apportionment regulation to include the charges on the claims in the apportionment ratio used to determine Medica's reimbursement by Medicare.  42 C.F.R. § 417.560(c).

92.     The Medicare statute also requires CMS to reimburse Medica for the disputed costs as part of its obligation to avoid cross-subsidization of Medicare expenses by non-Medicare enrollees.  SSA § 1861(v)(1)(A); 42 U.S.C. § 1395x(v)(1)(A).  The statute also required CMS to announce any new policies—such as the one it announced in this proceeding—through notice

and comment rulemaking.  SSA § 1861(v)(1)(A), 42 U.S.C. § 1395x(v)(1)(A); SSA § 1871(a),

42 U.S.C. § 1395hh(a).  CMS violated both of these statutory requirements here.

93.     Finally, the agency's MAC/Medica claim decision was arbitrary and capricious,

reflects an abrupt change in position without adequate explanation, lacks a logical basis,

constitutes an abuse of discretion, and violates basic principles of fair notice and due process, for

the reasons stated above.

94.     The agency's approach to extrapolation was both unlawful and arbitrary and

capricious.  The Administrator's position that Medica did not timely identify the specific claims

that it wished to present at the hearing in its initial appeal notice was in error, and finds no

support in regulation or statute.  In addition, the agency's extrapolation policy itself is unlawful.

If CMS is going to extrapolate, it has to do so in a way that is non-arbitrary.  And sampling and

extrapolating errors only to Medicare claims, and not performing parallel actions on non-

Medicare claims, is unjustifiable, as the hearing officer correctly found.  Finally, Medica

continues to believe that the seven disputed claims were not erroneously paid.  As a result, the

agency's conclusion that they were not properly paid should be reversed.

95.     Finally, sequestration:  The plain language of the sequestration statute evinces

Congress's clear intent to apply Part A and Part B sequestration reductions to payments for

"individual claims"—that is, claims from physicians, providers, and suppliers.  That is precisely

what Medica did.  There is no statutory basis for the agency also to apply sequestration cuts to

the year-end cost plan reimbursement.  (Even if there were, the agency failed to provide fair

notice of its policy until it was too late for Medica to implement it.)  The agency's position is

therefore both unlawful and arbitrary and capricious.

## PRAYER FOR RELIEF

For the foregoing reasons, Medica prays for the following relief:

A.  A declaration pursuant to 28 U.S.C. § 2201 that the Administrator's decision is

unlawful, arbitrary, and capricious.

B.  An order vacating and setting aside the Administrator's decision as unlawful,

arbitrary, and capricious.

C.  Injunctive relief as necessary.

D.  An order awarding Medica its costs, expenses, and attorneys' fees incurred in

these proceedings pursuant to 28 U.S.C. § 2412; and

E.  Such other and further relief as the Court deems just and proper.

Respectfully submitted,


   /s/ Susan M. Cook
Susan M. Cook (D.C. Bar No. 462978)
Marlan Golden (D.C. Bar No. 1673073)
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington DC 20004-1109
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
susan.cook@hoganlovells.com

*Attorneys for Plaintiff Medica Insurance Company,*
*Inc.*


Dated:  December 31, 2023