## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MEDICA INSURANCE COMPANY, INC.,**

    *Plaintiff,*

**v.**

**ROBERT F. KENNEDY, JR.,** *in his official capacity as Secretary of Health and Human Services,*

    *Defendant.*

Case No. 1:23-cv-3912-RCL

## <u>MEMORANDUM OPINION</u>

This case involves an appeal from a decision of the Administrator of the Centers for Medicare & Medicaid Services brought by Medica Insurance Company. Before the Court are Medica's motion for summary judgment [ECF No. 25] and Defendant Robert F. Kennedy Jr.'s cross-motion for summary judgment [ECF No. 30].[1]

Medica is a "cost-reimbursed" Health Maintenance Organization that contracts with the Secretary of Health and Human Services to provide certain services to Medicare beneficiaries who are enrolled in its healthcare plans. Medicare reimburses Medica for the "reasonable cost" of those services. The parties' dispute centers on the way in which Medica's reimbursement requests should have been calculated for the 2012 and 2013 cost years. Medica challenges three categories of adjustments made to its cost reports resulting in a reduction of millions of dollars in reimbursements per cost year. For the reasons that follow, the Court will **GRANT IN PART** and **DENY IN PART** both Medica's Motion for summary judgment and the Secretary's cross-motion, and **REMAND** the matter to the agency for further proceedings consistent with this opinion.

---

[1] Secretary Kennedy is automatically substituted as defendant in his official capacity as Secretary of Health & Human Services. *See* Fed. R. Civ. P. 25(d).

## I.    BACKGROUND

The Court begins by discussing the statutory and regulatory backdrop of this case before delving into the particulars of Medica's disputes with CMS. After that, the Court recounts the procedural history leading to the cross-motions for summary judgment.

### A.  Statutory and Regulatory Framework

#### i.    Medicare and Cost-Plan HMOs

The Medicare program is administered by the Secretary of the Department of Health and Human Service (HHS) through the Centers for Medicare & Medicaid Services (CMS). 42 U.S.C. § 1395kk(a). Through this program, the government provides health insurance to individuals who are either at least 65 years old or have a qualifying disability. *See id.* § 1395c. Parts A and B jointly form the foundation of Medicare coverage. In broad strokes, Part A covers inpatient care (like hospital stays), whereas Part B covers doctor visits and outpatient care. *See id.* §§ 1395d, 1395k. An entity that furnishes healthcare under Part A is called a "provider," while an entity that furnishes healthcare under Part B is called a "supplier." 42 C.F.R. § 400.202.

Under the traditional fee-for-service model, Medicare pays a suppliers' charges for services provided to a Part B enrollee. *See* 42 U.S.C. §§ 1395g, 1395*l*; 42 C.F.R. §§ 424.51, 424.55. But rather than filing a claim with Medicare directly, the supplier files a claim with an intermediary, known as a Medicare Administrative Contractor or "carrier." 42 U.S.C. § 1395kk-1; 42 C.F.R. § 421.404. The carrier helps administer the Part B fee-for-service program by processing supplier's claims and paying Medicare's share of those claims. *See* 42 C.F.R. 421.400.

As is relevant here, a Part B enrollee may alternatively receive benefits though a "health maintenance organization" (HMO) that has contracted with the Secretary to provide Part B services through in-network suppliers. 42 U.S.C. § 1395mm; 42 C.F.R. § 417.548. A beneficiary goes to an in-network supplier, who then charges the HMO a contractually predetermined price

for the Part B services provided. The HMO processes and pays the claim submitted by the supplier. Medicare then reimburses the HMO.

In practice, the reimbursement process is not so simple. This case centers around several disputes arising from the reimbursement process that applies to the particular type of HMO at issue here. Whereas most HMOs operate under Part C (also known as the Medicare Advantage program) and receive fixed payment rates per enrollee, a minority of HMOs are "cost plans," which are paid on a cost (rather than a per capita) basis. 42 U.S.C. §§ 1395mm(h)(1)(B), 1395mm(h)(2), 1395x(v)(1)(A). The central feature of a cost-plan HMO is that Medicare pays only the "reasonable cost" of the services provided. *Id.* §§ 1395mm(h)(2), 1395x(v)(1)(A). The Medicare Act defines "reasonable cost" as the amount "actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." *Id.* § 1395x(v)(1)(A).

### ii.    Reimbursement Process

The federal government reimburses cost plans through a two-step process of preliminary monthly payments followed by an end-of-year reconciliation process. *See* 42 C.F.R. §§ 417.570–417.576. The monthly payments are based on the annual budget and enrollment forecast submitted by the cost plan to CMS before the cost year begins. *Id.* §§ 417.570, 417.572. At the end of the cost year, the cost plan submits a cost report, documenting its total allowable costs for the year. 42 U.S.C. § 1395mm(h)(4); 42 C.F.R. § 417.576(b). At that point, CMS determines the total reimbursement due to the cost plan for the year and calculates any difference between the total amount due and the payments already made. 42 C.F.R. § 417.810(d)(1).

### a. Apportionment Ratio

The Medicare Act instructs CMS to create regulations for calculating "reasonable costs" such that Medicare costs "will not be borne by individuals not so covered" and non-Medicare costs "will not be borne by" the Medicare program. 42 U.S.C. § 1395x(v)(1)(A). Because HMOs that provide cost-plan Medicare coverage often also provide private insurance, they must adopt "methods of allocating costs" between Medicare and non-Medicare enrollees "in accordance with accounting procedures prescribed by the Secretary." *Id.* § 1395mm(h)(4). In other words, the costs of suppliers' services, as well as general administrative or overhead costs (such as employee salaries, office space, and equipment), must be apportioned.

To determine the share of costs attributable to Medicare enrollees, CMS multiplies these costs by a proscribed apportionment ratio. The ratio is a fraction, with the numerator comprising all suppliers' charges for services furnished to Medicare enrollees, and the denominator comprising all suppliers' charges for services furnished to Medicare *and* non-Medicare enrollees. 42 C.F.R. §§ 417.552–417.556. With this ratio, CMS determines what portion of the HMO's total costs are "reasonable costs" attributable to Medicare enrollees.

### b. Carrier-Paid Claims

Unsurprisingly, errors sometimes arise when professionals navigate this byzantine regulatory structure. Suppliers, such as physicians, sometimes mistakenly submit their claims to a carrier instead of the HMO, and sometimes they submit claims to a carrier *and* the HMO. Medica MSJ at 6, ECF No. 25-1. In either case, the carrier will pay the supplier, as it is statutorily required to do so, for all "clean claims" (i.e., claims without defects such as insufficient substantiating documentation). 42 U.S.C. § 1395u(c)(2)(A)(i), (c)(2)(B)(i). When the carrier pays a claim that the HMO is legally obligated to pay, courts generally refer to such claims as "carrier-paid claims."

*See, e.g.*, *Scott & White Health Plan v. Becerra*, 693 F. Supp. 3d 1, 6 (D.D.C. 2023).  One issue raised in this case concerns how HMOs should treat carrier-paid claims when calculating the apportionment ratio.

### c.  Sequestration

The relevant legal backdrop involves a further wrinkle.  In 2011, Congress amended the Balanced Budget and Emergency Deficit Control Act of 1985 to impose spending reductions on federal agencies beginning in 2013.  *See* Budget Control Act of 2011, Pub. L. No. 112-25, 125 Stat. 240; 2 U.S.C. §§ 900.  These spending cuts are known as "sequestration."  2 U.S.C. § 906.  In the Medicare Part B context, the Act imposed up to a 2% reduction to "individual payments for services," instructing the Office of Management and Budget (OMB) to prepare such reductions and directing the President to order them.  *Id.* §§ 901a(6)(A), 906(d)(1)(A).  In March 2013, the OMB issued a sequestration report applying the maximum 2% reduction to Medicare spending. OMB Report to the Congress on the Joint Committee Sequestration for Fiscal Year 2013 at 1, 4 (Mar. 1, 2013), https://obamawhitehouse.archive s.gov/sites/default/files/omb/assets/legislative_reports/fy13ombjcsequestrationreport.pdf [https:// perma.cc/2QA7-TP9D].  That same day, the President issued an executive order implementing sequestration.  *See* 78 Fed. Reg. 14633 (Mar. 1, 2013).

On May 1, 2013, CMS issued policy guidance stating that for the monthly payments made to the cost-plan HMOs, a "two percent reduction [would] be prorated based on the portion of the cost reporting period covered by the sequestration order, which became effective for Medicare programs on April 1."  Admin. R. (AR) 36–37.  As for the year-end reimbursement reconciliation, the guidance stated that "CMS [would] provide specific cost report preparation instructions at a later date."  AR 36–37.  On December 11, 2013, CMS issued guidance instructing cost plans to

report the sequestration amount as a line item on their 2013 cost report, which would be used by CMS to adjust the plan's reasonable costs.  AR 38, 65–66.  On February 28, 2014, CMS issued further guidance clarifying that cost plans could not input $0.00 in the sequestration line item even if they had proactively reduced their payments to their suppliers by 2%—thereby reducing the claims used to calculate reasonable costs.  AR 38.

### iii.   Audit Process

Upon receiving a cost report, CMS may conduct an audit to ensure that Medicare only pays for "reasonable costs."  42 U.S.C. §§ 1395mm(h)(3), (4), 1395x(v)(1)(A).  CMS may contract with a private firm to conduct this audit on its behalf.  *See Id.* § 1395kk(a) (permitting the Secretary to "perform any of his functions under" the Medicare program "directly, or by contract" as he "may deem necessary").

CMS (or its contractor) conducts an independent review of the audit and ultimately issues a final determination of the cost plan's reimbursement.  42 C.F.R. §§ 405.1803(a)(1), 417.576.  This determination reconciles the total Medicare reimbursements owed to the cost plan with the payments CMS issued to the plan throughout the year.  *Id.* C.F.R. § 417.576(e).  If CMS overpaid the cost plan, then the cost plan must pay CMS the difference.  *Id.*  But if reasonable costs exceed the issued payments, then the reverse is true.  *Id.* §§ 405.1803(c), 413.60(c).

If dissatisfied with CMS's decision, a cost plan can file an administrative appeal before a CMS Hearing Officer.  *Id.* §§ 405.1801(b)(2)(iii), 417.576(d)(4).  Once the Hearing Officer has ruled, the Administrator may review this decision and reverse or revise it; if the cost plan remains dissatisfied with the final agency decision, it may seek judicial review in federal court.  42 U.S.C. § 1395oo(f)(1).

### B. Factual History

### i. Medica's Processing of Carrier-Paid Claims

Medica contracts with suppliers to provide Medicare Part B services. After providing these services, in-network suppliers should send their claims to Medica. AR 6783. But sometimes physicians and other suppliers erroneously submit a claim to a carrier instead of, or in addition to, Medica. AR 6784. As explained above, a "carrier-paid claim" arises when the carrier beats Medica to the punch and pays the claim even though the obligation lies with Medica.

When this happens, the carrier often fails to pay the correct amount since it does not know the contractual terms between Medica and the in-network supplier, nor does the carrier know how much the Medicare enrollee owes by way of coinsurance, deductible, or copayment. AR 6784. Instead, the carrier essentially guesses the amount owed by paying the Medicare fee-for-service rate minus a presumed 20% copay. AR 6784.

This creates work for Medica on the back end. Once every week or so, CMS sends the cost plan a report on these carrier-paid claims, and with this report, Medica processes each claim through its own system to correct any inaccurate payment and to generate an "Explanation of Benefits" report for the patient's records. AR 441, 6783–84. In doing so, Medica fulfills its contractual obligation to its supplier by paying or invoicing the supplier the difference between what the carrier paid and what Medica should have paid. AR 131, 439, 459. Processing these claims also ensures that the Medicare beneficiary's copayments, deductibles, and medical records are kept up to date. AR 459–60.

Even though the carrier paid some portion of the claims that Medica was obligated to pay, Medica does not directly profit off carrier-paid claims. Instead, Medica subtracts the amount paid by the carrier in its system and then, when it compiles its cost report at the end of the year, it credits

that amount to the government.  AR 6784.  But Medica does use the carrier-paid claims to boost the sum it receives as reimbursement by including these claims in the numerator and denominator of the apportionment ratio.  AR 6784.  Medica justifies doing so because it went through the administrative hassle of processing the claim—which was necessary to properly pay suppliers and maintain patient records.

### ii.  Medica's Audit

CMS contracted with an independent auditing firm, Kearney & Co., to examine Medica's 2012 and 2013 cost reports.  Based on Kearney's audit, CMS found that Medica received $15,374,726 in overpayment for 2012 and $13,628,571 for 2013.  AR 4.  Medica challenged several aspects of Kearney's findings that CMS incorporated in its own review of the cost reports. The Court now outlines these disputes.

### a.  Carrier-Paid Claims

In its cost reports for 2012 and 2013, Medica included a line-item adjustment returning to CMS the funds Medica owed on the carrier-paid claims.  AR 6811–12.  Medica also included the supplier charges associated with these claims in the numerator and denominator of the apportionment ratio.  AR 6850.  Kearney found that Medica had improperly included the carrier-paid claims in the apportionment ratio.  AR 6850.  Excluding these claims reduced Medica's reimbursable costs by $5,705,654 for 2012, and $6,758,034 for 2013.  Gov. MSJ at 8, ECF No. 30.

### b.  Error-Detection Process

Kearney audited the accuracy of Medica's Medicare claims for each cost year by randomly sampling hundreds of claims to determine whether the payment codes were properly supported by the documentation that Medica provided.  AR 6819.  Medica protested that many of the errors

flagged by the auditor were nothing of the sort, and it provided explanations for why it disagreed with Kearney's position as the process unfolded.  AR 603–07.

To Medica's further consternation, Kearney audited only Medicare claims—it did not audit the *non*-Medicare claims.  Medica protested that this skewed the apportionment ratio because it resulted in asymmetrical treatment of the numerator (containing only Medicare claims) and denominator (containing Medicare and non-Medicare claims).  AR 6798.  But though Medica provided the auditors with a "data dump" of non-Medicare claim files, Kearney and CMS refused to audit them, reasoning that Medica—not the auditor or the agency—knew the criteria by which to judge whether non-Medicare claims were properly supported by documentation.  AR 6798.

After conducting the sampling, Kearney established a payment error rate based on claims that either should have been denied or should have received less payment.  AR 6821.  It then extrapolated that error rate across the universe of Medica's Medicare claims for each cost year.  AR 6821.  This adjustment affected the data used to calculate the apportionment ratio and further reduced Medica's reimbursable costs by $5,483,082 for 2012, and $2,491,989 for 2013.  Gov. MSJ at 9, ECF No. 30.

### c. Sequestration

CMS found that Medica had failed to reflect a 2% payment reduction in its 2013 cost report as required by Congress's sequestration mandate.  AR 6802.  Medica claimed that it had already implemented sequestration by reducing its payments to suppliers by 2%— meaning that this reduction was reflected in the claims on which Medica sought reimbursement.  AR 6802.  On this basis, Medica protested that applying sequestration on the backend resulted in reducing its total reimbursements by 2% twice.  CMS's application of the sequestration adjustment reduced Medica's costs by $2,745,884 for the 2013 cost year.  Gov. MSJ at 9, ECF No. 30.

### iii.  Procedural History

The parties presented these disputes to a CMS Hearing Officer, who held a multi-day evidentiary hearing.  AR 302, 431.  Regarding the carrier-paid claims, the Hearing Officer concluded that the applicable regulations justified Medica's inclusion of these claims in the apportionment ratio for the 2012 cost year, but that subsequent guidance from the agency precluded doing so for the 2013 cost year.  AR 134–36.  Next, the Hearing Officer found that, while the agency could use extrapolation as a permissible method for calculating an error rate, it could not extrapolate that error rate across only Medicare claims (and not *non*-Medicare claims) since doing so skewed the apportionment ratio.  AR 138–145.  And though the parties had settled the bulk of the sampled claims that Medica initially argued were improperly labeled as errors, seven disputed claims remained; the Hearing Officer found for Medica on five of them and for CMS on the other two.  AR 150–59.  As for sequestration, the Hearing Officer found that CMS improperly applied the 2% reduction to claims paid before December 11, 2013—when CMS issued guidance instructing cost plans to list the sequestration amount as a line item to be subtracted from the plan's reasonable costs.  159–165.

Upon reviewing the Hearing Officer's decision, the CMS Administrator overturned all portions favoring Medica.  AR 40–41.  First, the Administrator ruled that the carrier-paid claims should not have been included in the apportionment ratio for either cost years, reversing the Hearing Officer's determination that Medica properly included these claims in 2012.  AR 20–22.  Second, the Administrator reversed the Hearing Officer's determination as to extrapolation, holding that the agency could calculate an error rate for only Medicare claims.  AR 27–28.  Third, the Administrator found that Medica failed to preserve its dispute regarding the individual claims used to calculate the error rate; specifically, he asserted that Medica's initial hearing request did

not "describe each issue in detail for each specific item under appeal." AR 31. Fourth, and finally, the Administrator reversed course on sequestration, reasoning that CMS was statutorily required to apply the 2% reduction to Medica's reasonable costs. AR 33–40. Following the Administrator's decision, Medica filed this lawsuit. Complaint, ECF No. 1.

Before the Court are two motions. First, Medica has moved for summary judgment. Medica MSJ, ECF No. 25. Second, the Secretary opposes this motion and has cross-moved for summary judgment. Gov. MSJ, ECF No. 30. Medica has filed a memorandum in opposition to the Secretary's motion and in reply to the Secretary's opposition. Medica Reply, ECF No. 33. And the Secretary has filed a reply in support of his cross-motion. Gov. Reply, ECF No. 34. These motions are now ripe for review.

## II.    LEGAL STANDARDS

### A.  Summary Judgment in the APA Context

Because Medica has appealed from a final agency action under the Administrative Procedure Act, the standard governing the resolution of the parties' summary-judgment motions is not the familiar Rule 56 of the Federal Rules of Civil Procedure. *Truitt v. Kendall*, 554 F. Supp. 3d 167, 174 (D.D.C. 2021). Outside the APA context, a movant seeking summary judgment must show that "there is no genuine dispute as to material fact." Fed. R. Civ. P. 56(a). But fact issues that might preclude summary judgment in other contexts are often instead "issues of law in the context of agency review." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001). It is the job of the agency to make fact findings and "reach a decision that is supported by the administrative record." *Truitt*, 554 F. Supp. 3d at 174. The job of the district court, sitting as an "appellate tribunal," is to resolve whether the agency's decision was unlawful—which often includes reviewing whether the decision was indeed supported by the record. *Id.* (quoting *Am. Bioscience, Inc*, 269 F.3d at 1084).

### B.  Judicial Review Under the APA

The Administrative Procedure Act provides for judicial review of final agency action.  5 U.S.C. §§ 702, 704.  A reviewing court must "hold unlawful and set aside agency action" that is, among other defects, "arbitrary, capricious, . . . or otherwise not in accordance with law."  *Id.* § 706(2).  The APA generally limits judicial review to the administrative record.  *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010).

### III.    DISCUSSION

Medica raises a host of challenges to the agency's audit of its 2012 and 2013 cost reports.  At a high level, Medica contests the agency's treatment of the carrier-paid claims, disagrees with the way in which the agency applied an error rate to the data that went into the apportionment ratio, and protests the agency's application of sequestration to its 2013 year-end reimbursement.  The Court will assess each of these matters in turn.

### A.  Carrier-Paid Claims

The first issue raised by Medica in its motion for summary judgment proves simple because this Court has already addressed it, and CMS has accordingly conceded it.  While the administrative appeal for Medica's 2012 and 2013 cost reports was pending, this Court issued a ruling directly addressing whether CMS could exclude carrier-paid claims from the apportionment ratio for cost years 2006–2011.  *Medica Ins. Co. v. Becerra* (*Medica I*), No. 1:22-CV-1440 (RCL), 2023 WL 6314571, at *1 (D.D.C. Sept. 28, 2023).  In that decision, this Court held that by removing the carrier-paid claims from the apportionment ratio, CMS had violated the APA since this action contradicted the agency's own governing regulations.  *Id.*  Back then (and still today) the operative regulations required CMS to include "charges for covered services furnished to Medicare enrollees" in the numerator and the denominator of the apportionment ratio.  42 C.F.R. § 417.560(c).  For the reasons stated in *Medica I*, the plainest reading of § 417.560(c) "is that the

ratio includes carrier-paid claims." 2023 WL 6314571, at *9. By excluding these charges, the agency effectively amended the regulation without engaging in the necessary notice-and-comment rulemaking, and in any case, the change in position was arbitrary and capricious because it was unexplained. *Id.* at *12–14.

In its cross-motion, CMS states that it "is no longer contesting this issue" and is instead "actively working with Medica to resolve this issue for the 2012 and 2013 cost years." Gov. MSJ at 11, ECF No. 30. The agency further notes that it "has agreed to permit Medica," in accordance with this Court's interpretation of § 417.560(c), to continue accounting for carrier-paid claims on its costs reports for future cost years "unless and until CMS issues a final rule amending that regulation." *Id.* The Court will therefore grant summary judgment to Medica on this issue.

### B. Sampling and Extrapolation

Medica next challenges (1) the agency's decision to extrapolate an error rate derived from sampled claims; (2) the sampling and extrapolation methodology used; and (3) the reviewability and merits of seven specific claims decisions. For the reasons given below, the Court concludes that the Medicare Act permits CMS to use sampling and extrapolation to calculate and apply an error rate. As for the methodology used and reviewability of the individual claims decisions, the Court holds that the agency acted arbitrarily by failing to consider important aspects of these problems and therefore remands to the agency to consider these problems anew.

#### i. Permissibility of Extrapolation

Medica contends that the agency was not permitted to use extrapolation because it did not follow the procedures set out in 42 U.S.C. § 1395ddd(f)(3). This raises two questions: Do these procedures apply to the audit of the cost plan's cost reports and, if so, did the agency satisfy these requirements? Because the former proves tricky while the latter proves straightforward, the Court

will assume that § 1395ddd(f)(3) applies since the agency satisfied the minimal burden imposed by this provision.

### a.  Applicability of § 1395ddd(f)(3)

Under the Medicare statute, the HHS Secretary is responsible for administering the Medicare Integrity Program, which directs the Secretary to contract with outside entities to carry out specified activities—such as the "[a]udit of cost reports."  42 U.S.C. §1395ddd(a), (b).  When conducting such audits, a" [M]edicare contractor may not use extrapolation to determine overpayment amounts to be recovered . . . unless the Secretary determines that—(A) there is a sustained or high level of payment error; or (B) documented educational intervention has failed to correct the payment error."  *Id.* § 1395ddd(f)(3).  Medica contends that neither CMS nor Kearney made either threshold determination, meaning that it was unlawful for the agency to extrapolate an error rate based on the sampled claims.  Medica MSJ at 25, ECF No. 25.

CMS counters that the Medicare Integrity Program deals with the traditional Medicare fee-for-service model—not the HMO model.  This is evident, the agency argues, from the fact that § 1395ddd(f) refers to Medicare functions in the context of fee-for-service operations without explicitly mentioning HMOs.  Gov MSJ at 13, ECF No. 30; Gov. Reply at 3–5, ECF No. 34.  Specifically, this provision imposes procedures that apply when a Medicare contractor seeks to recover overpayment from "a provider of services or supplier."  42 U.S.C. § 1395ddd(f).  Providers and suppliers are entities that furnish healthcare services under Parts A and B of Medicare, respectively.  *Id.* § 1395x(d), (u); 42 C.F.R. § 400.202.  Recall that under the traditional fee-for-service model, providers and suppliers file their claims directly with a carrier, which processes and pays the claims on behalf of Medicare.  Under the HMO model, by contrast, Medicare does not deal directly with providers and suppliers—instead, the government deals with the HMO.  So,

14

CMS insists, the limitation on the use of extrapolation under § 1395ddd(f) does not apply to HMOs since this provision applies only to audits of providers and suppliers.

But cost-plan HMOs sit somewhere in between the traditional fee-for-service model and capitated Medicare Advantage (Part C) HMO plans. Unlike Medicare Advantage HMOs, and much like providers and suppliers, cost-plan HMOs' allowable reimbursements are based on reoccurring cost reports submitted to CMS. *Compare* 42 U.S.C. § 1395mm(h)(3) (cost plans "shall be subject to appropriate retroactive corrective adjustment at the end of each contract year so as to assure that such organization is paid for the reasonable cost actually incurred"), *with id.* § 1395g(a) (a provider "shall be paid, at such time or times as the Secretary believes appropriate . . . prior to audit or settlement . . . with necessary adjustments on account of previously made overpayments or underpayments")*.* And while the procedures governing periodic auditing of Medicare Advantage HMOs' financial records are laid out in some detail under *id.* § 1395w-27(d), CMS has not pointed the Court to any procedures in the Medicare statute specifically governing cost-plan audits that might supersede § 1395ddd(f)(3)'s plain language.

At most, CMS cites to the statutory definition of "reasonable costs," which clarifies that such costs "shall be determined in accordance with regulations establishing the method or methods to be used." *Id.* § 1395x(v)(1)(A). The definition further states that the regulations shall "provide for the making of suitable retroactive corrective adjustments where . . . the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive." *Id.* While it is true that this statutory definition instructs the agency to create regulations proscribing how reasonable costs should be calculated, § 1395x(v)(1)(A) says nothing about how CMS (or its contractor) should audit the data put into that calculation. What's more, the amount paid to providers and suppliers is sometimes *also* tethered to reasonable cost "as

determined under § 1395x(v)."  *Id.* §§ 1395f(b)(1), 1395*l*(2).  CMS does not reconcile this fact with its concession that § 1395ddd(f)(3) applies to providers and suppliers.

Notably, when Congress enacted the Medicare Advantage program (Part C) in 1999, it amended the Medicare statute to prohibit the creation of any new cost-plan HMO contracts but grandfathered in all existing ones.  42 U.S.C. § 1395mm(h)(5)(A).  This means that by the time Congress amended the Medicare Integrity Program in 2003 to include the limitation on the use of extrapolation, cost-plan contracts were already on the way out the door.  *See Gentiva Healthcare Corp. v. Sebelius*, 723 F.3d 292, 293 (D.C. Cir. 2013) (citing Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108–173, § 935, 117 Stat. 2066, 2407). Today, only nine of those grandfathered plans still exist.  AR 97.  As a result, the cost-plan HMO is an increasingly rare creature operating within the Medicare Parts A and B regime.  So it would not be surprising if components of the Medicare statute that speak in terms of the fee-for-service model were also applicable to the lingering cost plans subsumed within that framework.  In fact, even though cost-plan HMOs provide Parts A and B coverage, CMS itself states that the Medicare fee-for-service program is "also known as Medicare Part A and Part B"—conflating the distinction between the cost-plan and fee-for-service models.  U.S. DEP'T OF HEALTH AND HUM. SERV., 2023 REPORT TO CONGRESS: MEDICARE & MEDICAID PROGRAM INTEGRITY at 41, 87 n.197 (Oct. 2024) https://www.cms.gov/files/document/fy2023-medicare-and-medicaid-report-congress.pdf [https://perma.cc/R5UF-GEUB].

More importantly, the Medicare Integrity Program explicitly includes the "[a]udit of cost reports" as the type of activity a contractor under this subsection may carry out, without limiting this activity to the audit of *providers' and suppliers'* cost reports. 42 U.S.C. § 1395ddd(b)(2). Cost-plan HMOs' cost reports would then seem to come within the plain language of the activities

that Congress has tasked contractors to perform under § 1395ddd(b)(2).  And even if some sub-provisions of § 1395ddd(f) speaks in terms of providers and suppliers without mentioning cost plans, no language expressly so limits § 1395ddd(f)(3).  It therefore stands to reason that § 1395ddd(f)(3) imposes a condition precedent on Kearney's ability to use extrapolation to determine Medica's overpayment.

This is true even if, as CMS argues, the agency (through Kearney) had authority to audit Medica's cost report under § 1395mm.  This section allows for "[r]easonable cost reimbursement contract[s]" with HMOs and requires that such contracts permit "the Secretary, or any person or organization designated by him . . . to audit and inspect any books and records of the [HMO] that pertain . . . to services performed or determinations of amounts payable under the contract." *Id.* § 1395mm(h)(1)(B), (i)(3)(A)(ii).  But the fact that other provisions may permit the audit does not preclude § 1395ddd(f)(3) from proscribing a limit on how that audit may be conducted.

CMS next argues that § 1395ddd(f)(3) does not apply because Kearney is not a "[M]edicare contractor" as that term is defined under *id.* § 1395ddd(f)(2)(C), which cross-references the definition of "[M]edicare contractor" under *id.* § 1395zz(g).  The Administrator and Hearing Officer similarly concluded that "[M]edicare contractor" is a "term of art," referring to "a fiscal intermediary with a contract under § 1395h." AR 23, 26.  But the text of § 1395zz(g) explains that a "[M]edicare contractor" includes *both* a "[M]edicare administrative contractor . . . including a fiscal intermediary with a contract under [§] 1395h" *and* "[a]n eligible entity with a contract under [§] 1395ddd."  CMS makes no argument that Kearney failed to satisfy the eligibility requirements under § 1395ddd(c) and, as explained, Kearney performed activities authorized by § 1395ddd(b)(2).  The Court therefore fails to see what precludes Kearney from qualifying as a "[M]edicare contractor" under § 1395ddd.

For the foregoing reasons, the Court will assume that the limitation on extrapolation under § 1395ddd(f)(3) applies to the audit of Medica's cost report. But this conclusion is not the end of the matter because § 1395ddd(f)(3) includes language limiting the reviewability of the agency's decision to extrapolate. The Court turns to this issue next.

### b. Reviewability of CMS's Determination

Even though a "[M]edicare contractor may not use extrapolation to determine overpayment amounts" unless the Secretary finds that "there is a sustained or high level of payment error," or "documented educational intervention has failed to correct the payment error," § 1395ddd(f)(3) makes clear that "[t]here shall be no administrative or judicial review . . . of determinations by the Secretary of sustained or high levels of payment error." Moreover, the Secretary may delegate to its contractor the authority to make determinations of a sustained or high level of payment error. *Gentiva Healthcare Corp.*, 723 F.3d at 296. On this basis, CMS argues that "even if [the] audits at issue here were to fall under § 1395ddd(f)(3)," Kearney's use of "extrapolation is precluded from . . . review by statute." Gov. MSJ at 14, ECF No. 30.

Medica counters that this bar on judicial review only applies to whether the agency *correctly* found that there was a sustained or high level of payment error—it does not preclude reviewing the binary question of whether the agency made a finding in the first place. Medica Reply at 4, ECF No. 33. On this point, the Court agrees with Medica. As the D.C. Circuit has held, § 1395ddd(f)(3) "insulate[s] from judicial review the *merits* of the Secretary's 'sustained or high level of payment error' determination." *Gentiva Healthcare Corp.*, 723 F.3d at 296 (emphasis added). The bar on judicial review does not apply to the question of whether any determination was made at all.

18

However, Medica neglects an important fact: Kearney made the requisite determination.

Consider the following methodology used by Kearney for the 2012-2013 audits:

> Extrapolation: An overall financial error rate for the Medicare sample tested will be calculated. The overall financial error rate will be used to determine whether the error is material to the cost report based on *the materiality threshold* for the specific year under examination. This calculation is only to determine if extrapolation will be necessary, but not for the purpose of calculating the extrapolation adjustments. . . . Based on this calculation, we will not proceed to extrapolation if the total overall financial error rate . . . is *less than or equal to 1%.*

AR 139 (emphases added).

Medica does not acknowledge Kearney's materiality threshold, but it proves fatal to its argument. Even if Medica had contended that "the use of extrapolation was unlawful because the auditors never stated that the error rate was 'sustained' or 'high,' rather than merely 'material,'" such a challenge to the auditor's "materiality threshold" would be, as another session of this court has explained, "unconvincing." *Buckner v. Kennedy*, No. CV 23-03524 (AHA), 2025 WL 2192741, at *6 (D.D.C. Aug. 1, 2025). When faced with substantially similar facts, another court of this district held that a 1% materiality threshold was unreviewable since § 1395ddd(f)(3) "provides that the agency's choice of threshold is not subject to judicial review." *Id.* Any semantic distinction between an error rate that is "sustained or high" versus "material" does not convert the determination into a reviewable one. *Id.*

While Congress has instructed the agency to make determinations of a "sustained or high level of payment error," these determinations are "only a screening mechanism employed to decide whether extrapolation may be used to calculate a final overpayment amount." *Gentiva Healthcare Corp.*, 723 F.3d at 296. That these determinations are unreviewable imposes no unfairness on Medica since it can still challenge "both the final overpayment calculation and the extrapolation methodology that was used to calculate it"—as it has done here. *Id.*

### ii. Sampling and Extrapolation Methodology

Recall that Medica's reimbursable costs are calculated by multiplying total costs by a ratio comprising Medicare claims in the numerator over *all* claims (Medicare and non-Medicare) in the denominator. In conducting CMS's audit, Kearney sampled only Medicare claims, found an error rate, and extrapolated that error rate across only Medicare claims.

Medica asserts that by failing to sample and extrapolate an error rate for the non-Medicare claims, CMS acted unlawfully and arbitrarily since doing so for only the Medicare claims affected the numerator of the apportionment ratio to a greater degree than the denominator. In other words, Medica argues that extrapolating an error rate across only the Medicare claims results in overstating the non-Medicare claims. In Medica's view, this action was unlawful because it violated the Medicare Act's prohibition on cross-subsidization (by, in effect, allocating Medicare costs to non-Medicare enrollees) and was arbitrary because it broke with established practice and was supported by insufficient reasoning. The Court briefly discusses Medica's arguments regarding whether the action violated the Act before concluding that the agency acted arbitrarily.

### a. Contrary to Law

The Medicare Act generally forbids imposing Medicare costs on non-Medicare enrollees or vice versa. 42 U.S.C. § 1395x(v)(1)(A). This prohibition on cross-subsidization requires that the apportionment ratio reflect, as accurately as reasonably possible, the ratio of Medicare to total costs.

From a cost-allocation perspective, Medica has a point: failing to audit non-Medicare claims leaves open the possibility that the apportionment ratio is biased. If Medica made the same overcharging errors when processing non-Medicare claims as it did for Medicare claims, then correcting the error only as to the latter results in overstating the former. And if the non-Medicare

claims are overstated, then the denominator is inflated, making Medicare's share of costs look smaller.  Under these circumstances, correcting only Medicare claims understates Medicare's proportion of Medica's costs.

On the other hand, it could be that the *non*-Medicare claims are understated—that is, it's possible that, in the aggregate, Medica undercharged on its non-Medicare claims, in which case auditing these claims and extrapolating an error rate across the universe of such claims would *reduce* the apportionment ratio by enlarging the denominator.  But in any event, reasonable costs should be calculated to avoid imposing Medicare costs on non-Medicare enrollees or *vice versa*.  So unless the non-Medicare claims contain no error, the failure to calculate an accurate error rate for these claims either shifts costs onto Medicare enrollees or onto non-Medicare enrollees—in seeming defiance of the Medicare Act's prohibition on cross-subsidization.

The bottom-line question then is whether the Medicare Act allocates the responsibility of ensuring the accuracy of non-Medicare claims to CMS, or instead leaves that obligation with the cost plan.  CMS contends that it lacks statutory authority to do what is necessary to complete an audit of non-Medicare claims—namely, it argues that Congress has not authorized it to compel cost plans to hand over the documentation necessary to audit non-Medicare claims.  For example, Medica does not cite any statute purporting to authorizes CMS to demand the medical records of non-Medicare enrollees.  But the Court leaves for another day the issue of whether the action was contrary to law since it concludes the agency acted arbitrarily by failing to consider an important aspect of the problem.

### b.  Arbitrary or Capricious

To satisfy arbitrary-or-capriciousness review under the APA, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational

connection between the facts found and the choice made.'" *Motor Vehicle Mfrs Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43, (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Generally, agency action is arbitrary or capricious if the agency "fail[s] to consider an important aspect of the problem." *Id.* at 43. A reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

CMS argues that its ability to audit non-Medicare claims is constrained: while it can independently verify Medicare claims, it argues that it lacks the information necessary to establish an error rate for non-Medicare claims. In reviewing CMS's decision to not audit non-Medicare claims, the Administrator explained a host of practical considerations underlying the action:

> It would be impractical and, in some cases, impossible for CMS or its contractor to audit a . . . cost plan's non-Medicare claims. In many cases, it would be near impossible for CMS to ensure the non-Medicare claims it was auditing were complete and accurate, since CMS does not generally have access in the normal course to those claims. Additionally, it may be difficult for CMS to obtain non-Medicare claims due to privacy concerns. The types of supporting documentation that non-Medicare plans require may also be different, and in many cases less stringent, than what Medicare requires.

AR 27.

These are all legitimate concerns. For example, problems could arise if, as CMS argues, Medicare and commercial insurance providers set different requirements regarding the types of supporting documentation needed to audit claims. Gov. MSJ at 16, ECF No. 30. If Medicare and non-Medicare costs are not verified in the same manner, then the denominator is inherently asymmetrical since the two set of claims are subject to different auditing procedures or standards of accuracy.

Similarly, to audit non-Medicare claims, the agency needs supporting documentation for each claim. *Id.* at 17. Even if Medica avows it would have willingly provided this information,[2] it remains unclear whether other cost plans would do so too. According to the agency, "[t]he records shows that other cost plans . . . have refused to provide non-Medicare claims documents due to plans' privacy concerns." *Id.* at 16 (citing AR 1967–69). However, the Court cannot find any basis for this proposition in the pages of the administrative record cited by the agency. CMS has cited pages from Chapter 17 of the Medicare Claims Processing Manual, which covers "Drugs and Biologicals." If these citations have anything do with cost plans' privacy concerns, the Court cannot divine what that connection is. Given that the administrative record is over 8300 pages long, the Court is in no position to root out whatever evidence CMS meant to cite. Though CMS raises potential limits on its capacity to audit non-Medicare claims that could, in theory, justify its decision, the agency's failure to support these concerns with record evidence hampers the Court's ability to credit this reasoning.

What's crucial is that the Administrator did not adequately grapple, as the Hearing Officer did, with the fact that "to the extent that CMS adjusts the numerator but not the denominator" through extrapolation, "the apportionment ratio as a whole would be increasingly skewed." AR 148 n.18. Nor does CMS direct the Court to anything in the record indicating that the agency considered, before the administrative review began, the possibility that auditing only Medicare claims so skewed the apportionment ratio.

---

[2] While Medica provided CMS with its non-Medicare claims, AR 3860, it did not provide the agency with supporting documentation to audit these claims. Medica places the blame on CMS for failing to request this documentation. Medica Reply at 8, ECF No. 33 ("Just because the agency chose not to request access to non-Medicare records does not mean CMS could not have sought those records."). But more importantly, in explaining its methodology in advance of the audit, Kearney told Medica that its "sample procedures [would] include *only* Medicare claims." AR 6819 (emphasis added). Medica therefore had little reason to provide such documentation.

CMS contends that it sufficiently accommodated this concern because to the extent a cost plan believes that its cost reports reflect inaccurate payment of non-Medicare claims, "CMS permits cost plans like Medica to conduct their own audits of non-Medicare claims and submit results to CMS for consideration during its review and audit of the plan's cost reports." Gov. MSJ at 17. Specifically, CMS asserts that "cost plans can retain their own auditor to conduct a non-Medicare claims audit and update their non-Medicare data based on those audit findings, either before they submit their cost report or as an adjustment to the cost report." *Id.* (citing AR 1979–80, 2115).

Unfortunately, the record citations provided by the agency again stand for nothing of the sort; they instead appear to be unrelated pages drawn from Chapter 12 of the Medicare Claims Processing Manual, covering "Physician/Non-Physician Practitioners." While this could be an argument in the agency's favor, it rings hollow in the absence of record support.

Medica next asserts that CMS has a longstanding practice of sampling and extrapolating non-Medicare claims when it audits cost reports submitted by cost plans. AR 6823 (acknowledging that, "[h]istorically, . . . CMS has performed a small probe of sample Medicare and non-Medicare records in an effort to ensure that the costs of services borne by both Medicare and non-Medicare enrollees are apportioned appropriately"); AR 363–64 (Tr. 248:19–249:17) (testifying that CMS previously "did review non-Medicare claims" and conceding that "our sampling approach" and "extrapolation medical coding review has changed drastically"). In fact, in the lead up to the 2012 and 2013 cost years, CMS stated in a letter that, "[g]oing forward, CMS [would] test a probe sample of both the Medicare and non-Medicare records that support the apportionment statistics" and "[b]ased on the results of the sample, CMS [would] determine if extrapolation is warranted." AR 6823 (June 8, 2011 Letter). As CMS itself acknowledged, this

was in keeping with how the agency had historically conducted audits.  *Id*.  Less than a month later, CMS again "confirm[ed]" that it would "be reviewing both Medicare and non-Medicare claims."  AR 6825 (June 21, 2011 Email).  And again, a few weeks later, CMS stated it would "sample both Medicare and non-Medicare claims and make adjustments to both sides accordingly." AR 6827 (August 2, 2011 Email).

CMS does not explain why it reversed course after these reassurances.  In its cross-motion for summary judgment, the agency merely asserts that its "policy of not including non-Medicare claims in its coding review and sampling for use in extrapolation is well-established."  Gov. MSJ at 15, ECF No. 25 (citing AR 2106–19).  Yet pages 2106 to 2119 of the administrative record primarily cover billing procedures for anesthesia services and other sundry details of Medicare billing for physicians and nonphysician practitioners.  The Court did not find support in those portions of the record for a well-established policy of not auditing cost plans' non-Medicare claims.  In its reply brief, CMS properly cites the record for evidence that while it had, for a time, audited non-Medicare claims, it "stopped because practical issues made it virtually impossible." Gov. Reply at 10, ECF No. 34 (quoting AR 4177) (internal quotation marks omitted).  But the source cited is merely the agency's own brief in the administrative appeal of a different case.  This is not enough to convince the Court that the agency engaged in reasoned decision-making when it decided to reverse course.

The Court therefore holds that CMS has not "complied with the procedural requirement that it provide a reasoned explanation for its action."  *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 35 (2020).  To be exact, the agency failed to sufficiently consider the important issue of whether sampling and extrapolating an error rate for only the Medicare claims unduly skews the apportionment ratio.  However, the Court realizes that there may be ways

to accommodate Medica's concern short of sampling and extrapolating an error rate for non-Medicare claims in an identical fashion to the methods used for Medicare claims. The Court is also mindful that there may be limits on the agency's statutory authority to conduct a full-fledged audit of cost plans' non-Medicare claims. Given the countervailing considerations at work, the "appropriate recourse" is remand to the agency "so that it may consider the problem anew." *Id.*

### iii.  Individual Claims Decisions

Of the sampled Medicare claims that were used to calculate the error rate, Medica contests several specific error findings. While Medica named 46 disputed claims in its opening brief before the Hearing Officer, the parties settled a number of those claims throughout the administrative appeal.[3] Seven disputed claims remain.

CMS contends that Medica has waived review of these seven claims because Medica's administrative hearing request did not identify each specific claim that the cost plan intended to appeal and instead promised to do so later. AR 8063 ("On appeal, Medica will establish specific claims identified by Kearney were properly paid and therefore are reimbursable."). While the Hearing Officer accepted briefing on the issue of timeliness and ultimately held that Medica had timely identified the disputed claims, AR 6338, the Administrator reversed course and held that Medica had failed to preserve the disputed claims since they appeared nowhere in the cost plan's hearing request. AR 31–32.

Before this Court, Medica contends that the Administrator's decision was arbitrary or capricious, and that it violated the cost plan's due process rights. While the former argument has some merit, the latter does not.

---

[3] Nine of those settlements are contingent upon the Court's determination of the timeliness of Medica's challenge to the individual claims. Medica MSJ at 29, ECF No. 25-1.

### a. Arbitrary or Capricious

Cost-plan HMOs have a right to an administrative hearing when contesting an auditor's findings. 42 C.F.R. §§ 405.1801(b)(2)(iii). The procedures governing appeals before the Provider Reimbursement Review Board ("the Board") apply "to the maximum extent possible" to such proceedings. *Id.* § 405.1801(b)(2)(iv); *see also Rocky Mt. Health Maint. Org., Inc. v. Azar*, 384 F. Supp. 3d 80, 94 (D.D.C. 2019) ("The rules relating to Administrator review of a Board decision . . . are applicable to the maximum extent possible for any nonprovider hearing." (internal quotation marks and citation omitted)).

The Board's rules permit the agency to "dismiss with prejudice" any notice of appeal from a contractor's final determination of total reimbursements if the notice does not adequately identify the issues being appealed. 42 C.F.R. § 405.1835(b). To be precise, the rules provide that a hearing request must describe "each specific item under appeal," including "a separate explanation of why, and a description of how" the appellee "is dissatisfied with the specific aspects" of the contractor's determination, an account of why the Medicare payment was incorrect for each item (or why the appellee could not so determine), and how payment should have been calculated differently. *Id.* § 405.1835(b)(2)(i)–(ii). After initially submitting a hearing request, the appellee may add a new issue by submitting a written request within 60 days of the 180-day period following receipt of the contractor's final determination. *See id.* § 405.1835(e)(3). But the written request must describe the issue with the same level of specificity required for an initial hearing request. *Id.* § 405.1835(e)(1).

Medica did not identify any specific claims in its administrative hearing request submitted on October 26, 2020. AR 8062–68. The cost plan instead indicated that it would establish which claims it intended to contest once a briefing schedule had been set. AR 8063. When it eventually

provided a list of disputed claims in its opening brief, it provided only a label describing the basic disputed issue and did not give any developed reason as to why those claims were wrongly adjusted.  AR 31–32, 6800–01.  Moreover, by the time Medica submitted its opening brief on April 9, 2021, the 180-day period for submitting a request to add an issue had already passed.  AR 31–32; 6805.  After the initial round of briefing before the Hearing Officer, Medica eventually presented arguments supporting its position on each disputed claim in its reply brief.  AR 5878–93.

CMS argues that Medica has waived its challenge to the disputed individual claim decisions because its hearing request did not conform to the agency's procedures under § 405.1835.  Medica's hearing request did not set out its theory as to how and why CMS erred in deciding the unspecified individual claims, nor did the cost plan indicate how payment should have been determined had the agency decided the disputed claims in Medica's favor.  At most Medica indicated an intent to dispute some number of claims at some point in the proceedings.

Medica, on the other hand, suggests that strictly applying § 405.1835 under these circumstances would be inequitable.  First, the cost plan notes that, during the audit process, it exchanged spreadsheets with Kearney reflecting its positions on the individual claims determinations, and it provided the auditor supporting documentation for each disputed claim.  AR 6351.  Medica also observes that when it filed its initial appeal request, identifying claims decisions as an item to be appealed without identifying which claim, CMS did not at that time seek clarification as to which particular claims Medica sought to challenge.  AR 6352, 6338–40.  In fact, the agency waited seven months after receipt of the appeal notice to assert that Medica's individual-claims challenges had been waived.  AR 6352.  This meant that the agency raised the timeliness issue for the first time after Medica had already submitted its opening brief and after

the 180-day period for amending the initial hearing request had lapsed.  Medica also faults CMS of cherry picking the Board rules applicable to the cost plan's hearing.  In particular, Medica contends that the agency denied the cost plan the Board's procedural protections such as discovery and the right to jointly compile the record.  *See, e.g.*, 42 C.F.R. § 405.1853(e).

Medica does not contend that it every sought discovery or the opportunity to jointly compile the record.  Nor does Medica explain what information discovery would have uncovered that would aid in its challenge to Kearney's audit that the cost plan did not already possess.  But even if Medica was not injured by the absence of these procedures, that does not mean that CMS lacked a duty to conscientiously employ the applicable rules.

While Medica does not state it in precisely these terms, the cost plan asserts something akin to an equitable-estoppel argument—contending that CMS cannot enforce the Board's rules in a manner adverse to Medica because the agency failed to abide by its own regulations, then raised the issue of waiver at the eleventh hour.  Whether equitable estoppel strictly applies in this setting is dubious.  *United States ex rel. Landis v. Tailwind Sports Corp*., 308 F.R.D. 1, 5 (D.D.C. 2015) (observing that the standard for estopping a government defendant is "an exacting one" (citation omitted)).  But the fairness arguments raised by Medica were worthy of consideration when the agency decided whether the cost plan's challenges to the individual claims decisions should be dismissed.

Under both 42 C.F.R. § 405.1868(a), (b) and § 405.1835(b), the Hearing Officer (in lieu of the Board) was entitled to either dismiss the challenges to the individual claims decisions *or* take any other remedial action he deemed appropriate.  The Hearing Officer did not reach the remedy issue, concluding instead that Medica sufficiently complied with the rule, but presumably, this remedial open-endedness includes the discretion to excuse the waiver.  At the least, the

Administrator should have considered whether dismissal was the appropriate remedy under the circumstances. The Court thus holds that the Administrator's failure to assess Medica's fairness concerns was arbitrary. So, notwithstanding the fact that Medica's initial hearing request did not, on its face, follow § 405.1835(b)'s mandate, the Court will remand to the agency for the Administrator to consider whether dismissal was the appropriate remedy under the circumstances, and if not, then to review the Hearing Officer's decisions as to the individual claims decisions in the first instance.

### b. Due Process

Medica also challenges the dismissal of its individual claims appeals as violating basic principles of fair notice and due process. Observing that the Hearing Officer's scheduling order did not set a deadline for identifying the claims to be appealed, Medica asserts that "[t]here would be serious due process and fair notice concerns if the agency were allowed to retroactively impose deadlines that appear nowhere in the scheduling order governing the administrative appeal." If the scheduling order lacked specificity, perhaps that may also support excusing Medica's waiver, but the Court is not persuaded that Medica has raised a violation of due process. Medica knew or should have known of the procedural rules governing its administrative appeal that were promulgated through notice-and-comment rulemaking in 2008. 73 Fed. Reg. 30190 (May 23, 2008).

What's more, Medica cited § 405.1835(b)(2) in its initial hearing request, stating that "[f]or each of the issues in dispute," Medica had explained "why (and a description of how) it is dissatisfied with CMS's determination—including why the adjusted Medicare payment is incorrect for each disputed item, and how and why the Medicare payment must be determined differently for each disputed item." AR 6392. So Medica's suggestions that the Board's rules do

not apply to cost plans, or that Medica was ignorant of those rules, fall flat. *See, e.g.*, Medica Reply at 10, ECF No. 33 (maintaining that the agency "insists on applying [the Board's] rules written for providers to nonprovider entities like Medica").

Medica also argues that the Administrator offended due process principles by requiring the cost plan to "submit all evidence in support of [its] arguments years prior to the hearing." Medica MSJ at 30, ECF No. 25-1 (emphasis omitted); *see also* Medica Reply at 13, ECF No. 33. But the Administrator focused solely on whether Medica's initial hearing request satisfied § 405.1835's requirement that claims be stated with specificity. AR 31–32. While the Administrator mentioned that Medica sought to supplement the record after the initial round of briefing, he did so to illustrate the point that Medica did not explain its dispute as to the individual claims until its *reply* brief. AR 32. The Administrator did not rehash the parties' arguments, made before the Hearing Officer, as to 42 C.F.R. § 405.1853(b)(2), which requires the parties to establish the relevant facts and arguments regarding the merits of each claim in a "position paper" submitted in advance of the hearing. AR 6339–40. So to the extent the agency may have, at one time, argued that Medica was required to present all supporting evidence in its opening brief, the issue before this Court is simply whether Medica properly stated the bases for its appeal of the individual claims decisions. Put another way, the Administrator treated the issue more like a failure to state a claim than a failure to establish the facts—and that is the reasoning that this Court has reviewed. As for § 405.1835, specificity requirements are not unfamiliar, much less violative of due process. *Cf.* Fed. R. Civ. P. 9 (certain claims require detailed pleading).

## C. Sequestration

"To achieve the total percentage reduction" in Medicare programs, Budget Control Act instructed that "OMB shall determine, and the applicable Presidential order . . . shall implement,

the percentage reduction that shall apply." 2 U.S.C. § 906(d)(1).  In the case of health insurance programs under Medicare Parts A and B, sequestration applied "to individual payments for services furnished during" the 2013 cost year.  *Id.* § 906(d)(1)(A).  The Act provides that the terms "sequester" and "sequestration" "refer to or mean the cancellation of budgetary resources provided by discretionary appropriations or direct spending law."  *Id.* § 900(c)(2).

Medica argues that the Secretary violated the Medicare Act by applying the 2% sequestration reduction to the plan's 2013 reasonable costs.  That is, Medica contends that the plain language of the sequestration statute directs cost plans to pass along the 2% loss to its in-network suppliers by reducing payments on their individual claims and that there is no statutory basis for CMS to apply a 2% reduction to its year-end reimbursement.  Medica MSJ at 38, ECF No. 25-1.  According to Medica, it has "met its statutory obligation."  *Id.*  The Secretary counters that only the government has an obligation to impose a 2% reduction of the costs reported by a cost plan—irrespective of what the private HMO pays in-network providers.

The Hearing Officer found that to the extent that Medica could provide supporting auditable documentation that it had reduced payments to in-network providers by 2% for claims paid before December 11, 2013, then a year-end 2% reduction should not apply.  AR 32.  The Administrator reversed, holding that "the statute clearly instructs and authorizes only CMS to apply the sequestration reductions as a factor in the Federal Budgetary process, (an act over which the cost plans have no authority)."  AR 40.

Medica is not the first to argue "that sequestration was implemented by obligating the plan to reduce its outlays, rather than obligating the government to reduce its outlays."  *Buckner*, 2025 WL 2192741, at *3.  As in *Buckner*, this argument does not withstand scrutiny.  The Budget Control Act states that the President "shall implement" the sequestration reductions to Medicare

32

spending in accordance with the OMB's determinations.  2 U.S.C. § 906(d)(1).  It follows that the President can do so though the appropriate executive agency—here, CMS.  Nothing in the plain language of the statute "purports to obligate a private party, like the plan, to reduce payments to achieve the goals of sequestration on behalf of the government."  *Buckner*, 2025 WL 2192741, at *4.  Put differently, the notion that the Act means to interfere with the private contracts between a cost-plan HMO and its in-network suppliers, without expressly saying so, fails to persuade.

Medica points to specific language in the Budget Control Act to argue that Congress intended for the cost plans grandfathered into the Parts A and B regime to implement sequestration. More precisely, Medica homes in on the fact that Congress chose to apply sequestration to "individual payments for services furnished."  2 U.S.C. § 906(d)(1)(A).  In Medica's view, this language cannot refer to the payments Medicare makes to Medica; instead, the statute must refer "to the payments made by Medica during the year to individual physicians and suppliers."  Medica MSJ at 38, ECF No. 25-1.

But § 906(d)(1)(A) does not say "individual payments for services furnished *by physicians and suppliers.*"  And Medica offers no argument as to why it should be seen as furnishing a service—namely, the service of managing healthcare by providing Medicare enrollees access to a network of medical professionals.  In keeping with this understanding, CMS applied a 2% reduction to each of Medica's interim payments and its year-end cost report.  AR 36–37.

Recall that under the normal fee-for-service model, CMS contracts directly with providers and suppliers under Medicare Parts A and B and pays them through a carrier; in those cases, § 906(d)(1)(A) instructs CMS—or its agent, the carrier—to reduce by 2% its payments for services furnished by providers and suppliers.  But in the case of a cost plan, CMS has no contractual relationship with the providers and suppliers themselves.  And unlike a carrier, Medica is not an

agent "hired to make reimbursements as directed by, and on behalf of, the government." *Buckner*, 2025 WL 2192741, at *4 n.3.  Rather, Medica *receives* reimbursements for its "reasonable costs."[4] This suggests that, under § 906(d)(1)(A), the cost plan takes the place of the supplier, not the carrier—which means that "individual payments" refers to those made by CMS to the cost plan, not the payments made by the cost plan to its suppliers.

Next, to the extent that Medica focuses particularly on the difference between "individual payments," under § 906(d)(1)(A), and "monthly payments," under *id.* § 906(d)(1)(B), the distinction is between cost-reimbursement models (e.g., fee-for-service and cost plans) versus capitated-payment models (e.g., Medicare Advantage HMOs).  While CMS happens to pay cost plans on a monthly interim basis, this appears to be a matter of regulation, not statute.  *See* 42 C.F.R. §§ 417.570, 417.572.  By contrast, the Medicare Act specifies that the Secretary "shall make monthly payments" to Medicare Advantage HMOs.  42 U.S.C. § 1395mm(a)(1)(D).  So it makes sense that the Budget Control Act would not refer to "monthly payments" made to cost-plans since the government could devise a different interim payment period through rulemaking.

Finally, Medica contends that CMS failed to provide adequate notice of its intention to implement sequestration by applying the 2% reduction to the year-end cost reports.  More precisely, Medica asserts that it was unaware of the agency's position until December 2013—long after the cost plan had already processed the bulk of its 2013 claims.  But since the plain language of § 906(d)(1)(A) of the Budget Control Act leaves no room for Medica's interpretation, the Court finds Medica's fair notice argument unavailing.  Put simply, the Act in no way purports to delegate to cost plans the executive's duty to implement federal budget cuts.

---

[4] If Medica reduced its contracted payments to suppliers by 2%, then the reduced payments are the amounts that Medica incurred in furnishing those services.  So while its actions reduced its total reimbursements, it also reduced its costs.  It would therefore seem inaccurate to suggest that Medica faced the burden of sequestration twice.  *See, e.g.*, Medica MSJ at 38, ECF No. 25-1 (referring to "CMS's Double Reduction of Medica's Payments").

## IV.    CONCLUSION

For the foregoing reasons, the Court will **GRANT IN PART** and **DENY IN PART** both Medica's motion for summary judgment and the Secretary's cross-motion for summary judgment. The Administrator's decision in this matter will be **VACATED** as to the carrier-paid claims, the extrapolation methodology, and the individual claims decisions. The matter will be **REMANDED** to the agency for further proceedings consistent with this Memorandum Opinion. This case will be terminated on all active dockets of this Court.

A separate Order consistent with this Memorandum Opinion shall issue.


Date: _____9 - 30 - 25_____

_Royce C. Lamberth_
Royce C. Lamberth
United States District Judge